**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

KAREEM BLOUNT,                       :

       Plaintiff          :    CIVIL ACTION NO. 3:26-cv-126

       v.                 :          (JUDGE MANNION)

TAYLOR TALASKY (P.A.), *et al*.,     :

       Defendants         :

<u>**MEMORANDUM**</u>

Currently before the Court are *pro se* Plaintiff Kareem Blount ("Blount")'s application for leave to proceed *in forma pauperis* ("IFP Application") and complaint in which he asserts causes of action under 42 U.S.C. §1983, the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("RA"), and Pennsylvania state tort law. For the reasons stated below, the Court will grant the IFP Application, dismiss Blount's federal claims with prejudice, decline to exercise supplemental jurisdiction over his state-law claims, dismiss his state-law claims without prejudice, and direct the Clerk of Court to close this case.

## I.    BACKGROUND

Blount, a convicted and sentenced state prisoner currently incarcerated at Pennsylvania State Correctional Institution Benner Township ("SCI Benner Twp."), commenced this action by filing his complaint, which

the Clerk of Court docketed on January 20, 2026. (Doc. 1.) When he filed his complaint, Blount did not pay the fee or seek leave to proceed *in forma pauperis*; as such, an Administrative Order issued requiring him to either pay the fee or apply for leave to proceed *in forma pauperis* within thirty days or risk dismissal of this action. (Doc. 2.) Blount timely complied with the Administrative Order by filing his IFP Application and certified prisoner trust fund account statement on February 17, 2026. (Docs. 4, 5.)[1]

In his complaint, Blount names as Defendants: (1) Dr. Laurel R. Harry ("Harry"), the Secretary of the Commonwealth of Pennsylvania Department of Corrections ("DOC"); (2) Bradley Booher ("Booher"), the Superintendent of SCI Benner Twp.; (3) Taylor Talasky ("Talasky"), a Physician's Assistant at SCI Benner Twp.; (4) Lisa Campbell ("Campbell"), a Registered Nurse Supervisor ("RNS") at SCI Benner Twp.; and (5) the DOC. *See* (Doc. 1 at 1–

---

[1] The federal "prisoner mailbox rule" provides that a *pro se* prisoner's submission is deemed filed "at the time [the prisoner] delivered it to the prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 276 (1988). When filing his IFP Application and certified account statement, Blount did not include a declaration stating when he delivered these documents to prison authorities for mailing to the Clerk of Court. Nonetheless, the envelopes containing these documents are postmarked February 17, 2026. *See* (Docs. 4 at 4; 5 at 5). As such, the Court uses February 17, 2026, as the filing date even though the Clerk of Court did not docket the IFP Application and certified account statement until February 23, 2026. *Cf.* Fed. R. App. P. 4(c)(1)(A)(ii) (providing that evidence such as a postmark may establish the date of filing of a notice of appeal by a prisoner).

2). His allegations against Defendants relate to events that allegedly occurred while he was incarcerated at SCI Benner Twp. *See* (*id.* ¶9).

Blount alleges that he suffered an asthma attack on June 29, 2025, at approximately 5:20 p.m. *See* (*id.*). He pushed the emergency button inside his cell, informed a correctional officer that he was experiencing an asthma attack, and asked the correctional officer to contact the medical department. *See* (*id.*). The correctional officer contacted the medical department, and medical department personnel told the correctional officer to send Blount to the medical department so he could receive medical attention for his asthma attack. *See* (*id.* ¶10).

Blount proceeded to the medical department where he was examined by a nurse. *See* (*id.* ¶11). The nurse "heard [Blount's] lungs wheezing badly and immediately [provided him with] a [d]uo-[n]ebulizer breathing treatment." (*Id.*) Blount started using the duo-nebulizer, and the nurse contacted the on-call provider, Wellpath, via a video conference. *See* (*id.* ¶12). "Wellpath informed the medical department to prescribe [Blount] an additional two more [d]uo-[n]ebulizer breathing treatments." (*Id.*)

On June 30, 2025, Blount went to sick call and saw Talasky. *See* (*id.* ¶13). Blount informed Talasky of his "medical emergency and having an [a]sthma [a]ttack" the day prior, and he expressed that "the hot and humid

- 3 -

weather caused [him] to suffer an asthma attack." (*Id.*) As such, Blount asked Talasky to prescribe him with a daily nebulizer due to the "hot and humid weather which aggravates and causes [him] to suffer asthma attacks." (*Id.* ¶14.) Blount asserts that Talasky "denied [him] this life[-]saving treatment option even after [he] almost died the day before." (*Id.* ¶15.)

Blount alleges that he also explained to Talasky that Wellpath had prescribed two additional duo-nebulizers to relieve his asthma attack, and he asked Talasky for the two duo-nebulizers as authorized by Wellpath. *See* (*id.* ¶16). Talasky denied Blount the two duo-nebulizers even though Wellpath had prescribed them. *See* (*id.*).

Following Talasky's actions, Blount filed a formal grievance about "this matter." (*Id.* ¶17; Doc. 1-1 at 1–2.) Blount complained as follows:

> On 6-29-25 at approx. 520 [sic] p.m. I had an [a]sthma [a]ttack[.] I hit my emergency button and informed the block officer[.] I was then told to come to the desk at which time C/O Huyer called the medical department[,] informing them of my medical emergency. The medical Dept. told C/O Huyer to send me down to medical so that I can be examined. While being examined the nurse (Nurse Zoe) heard my lungs wezzing [sic] badly and immediately prescribed me a []mini nebulizer breathing treatment. Additionally[,] the medical [d]ept[.] contacted [the] on[-]call provider[,] Wellpath[,] via video conference to inform them of my medical emergency[.] Wellpath prescribed me two additional mini-nebulizer breathing treatments if I needed it. I was added to sick call the following day on 6-30-25[.] I was seen by Physician Assistant Taylor Talosky [sic]. I informed her of my medical emergency with having an [a]sthma attack and letting her know that the hot and humid weather caused by [a]sthma [a]ttack. Due

- 4 -

to these events[,] I asked her . . . to prescribe me a daily mini-nebulizer [b]reathing treatment because the hot and humid weather aggravates and causes me to have asthma [a]ttacks. . . . Talasky denied me this life saving treatment option even after I almost [d]ied. I emphasized this point. [Talasky d]enied my pleas. Her actions violated my Pennsylvania and United States [c]onstitutional rights. The Eighth Amendment forbids failing to act despite knowledge of a substantial risk of serous harm. Farmer-v-Brennan [sic], 511 U.S. 825, 842 (1994). Surely me being a life long [sic] [a]sthmatic sufferer and just having an [a]sthma attack the [d]ay before constitutes a substantial risk of serious harm. The relief I am seeking is for me to be provided a daily mini-nebulizer [b]reathing treatment and for my medical case file to be removed from . . . Talasky [sic] docket. My life is in [d]anger while in her care. Additionally[,] I seeks [sic] [d]amages in the [a]mount of $500,000.

(Doc. 1-1 at 1–2.)

On July 18, 2025, Campbell issued an Initial Review Response denying Blount's grievance. *See* (Docs. 1 ¶18; 1-2 at 2–3). Campbell's response stated as follows:

I am in receipt of your official grievance dated 06/30/25 which you claim you were denied "life saving treatment" of daily nebulizers after "I almost died" from a[n] asthma attack. You claim this violated your Eighth Amendment right and are seeking $500,000 in damages, be [sic] provided daily nebulizer treatments[,] and for your medical case file be [sic] removed from PA-C Talasky.

I have investigated your claims and have found the following: On 06/29/25 you were seen by nursing for complaints of shortness of breath and wheezing after working out and exerting yourself, with no relief after using your rescue inhaler 10 times. You were assessed and found with wheezing in both lungs. The on-call provider was contacted and ordered three duoneb [sic] nebulizer treatments. You were administered the first duoneb [sic]

- 5 -

treatment which relieved your symptoms, your lungs were clear, you "did not wish to have the other two" treatments, and returned to the block with a follow-up scheduled for sick call the next day. You were educated by the nurse prior to returning to the block with the proper use of a rescue inhaler and instructed to contact medical if you did not get relief after two uses or if your symptoms returned or worsened. On 06/30/25 you were assessed by PA-C Talasky on sick call; you reported your asthma was not bothering you anymore and your lungs were clear. You requested daily nebulizer treatments and were told they were not clinically indicated as your symptoms were resolved. There are no further reported symptoms or sick call requests noted in your chart since your visit 06/30/25.

The Eighth Amendment protects your rights from cruel and unusual punishment. Furthermore, you report "the Eighth Amendment forbids failing to act despite knowledge of a substantial risk of serious harm[.]" A licensed provider denying a requested medical treatment does not constitute cruel and unusual punishment or demonstrate failure to act on knowledge that may put you at substantial risk or serious harm as you claim. PA-C Talasky made her clinical decisions based on her assessment of your lungs which did not indicate you needed daily nebulizer treatment.

In light of this information, you were not denied "life[-]saving treatment" as you claim. You were properly treated for an asthma exacerbation that resolved and no further changes in your treatment were medically necessary. You did not almost die from this exacerbation as you claim as your symptoms resolved after one nebulizer treatment and your lungs remained clear thru [sic] the next day. Therefore, this grievance is denied, you will not beawarded [sic] a monetary amount or be prescribed daily nebulizer treatments. PA-C Talasky will not be removed from your "case file[.]" You are encouraged to continue to report any new symptom [sic] or non-emergent medical concerns via the sick call process and be receptive to the provider(s) recommendations.

(Doc. 1-1 at 2.)

Blount appealed from Campbell's Initial Review Response on July 23, 2025. *See* (Docs. 1 ¶19; 1-3 at 2–3). In his appeal, Blount stated:

On 7-18-25 Grievance #1154869 was denied. This appeal follows. On 6-29-25 at approx. 5:20 p.m. I had an [a]sthma [a]ttack due to extra heat and humidity. Upon arriving at the medical [d]epartment[,] I was examined by Nurse Zoe. She heard my lungs wezzing [sic] badly and immediately prescribed me a duoneb [n]ebulizer treatment. Additionally, Nurse Laura contacted the on-call provider via video conference. The on-call provider ordered two-additionally [sic] duoneb [n]ebulizer treatment [sic]. In the Initial Review Response[,] "RNS" Lisa Campbell said I did not wish to have the other two treatments. Using common and medical sense, after being administered one duoneb [n]ebulizer treatment, it would have been wise to save the additional treatments [f]or a later follow up [d]ate. Using three [b]ack-to-back-back [sic] [d]uoneb [n]ebulizer treatments isn't safe. [T]hese treatments raises your [b]lood pressure to [d]angerous [l]evels when used in excess amongst other reasons I wanted to have the treatments in reserve to use later on at [sic] a later date. The following day when I was seen at sick call [by] Physician [A]ssistant C. Talasky[,] I informed her of my medical emergency with having an [a]sthma [a]ttack due to extreme [h]eat and humidity. Due to these events[,] I asked for a [d]aily duoneb [n]ebulizer [b]reathing treatment because the hot and humid weather aggravates and causes me to have asthma [a]ttacks. PA-C Talasky denied me this life[-]saving treatment option even after almost dying, even as I emphasized this point my pleas were [d]enied. In the Initial Response[,] "RHS" Lisa Campbell also denied my pleas. She quoted PA-C Talasky as saying if my rescue inhaler didn't work after two uses or if my symptoms worsened I was to contact medical. Anything worse then [sic] an [a]sthma [a]ttack is "[d]eath." Why do I need to be put in a medical [e]mergency in order to receive a duoneb [n]ebulizer [b]reathing treatment. From October of 2018-thru [sic]-November of 2019, I was given two-[d]aily [sic] duoneb [n]ebulizer [b]reathing treatments here at SCI-Benner Township. How come [sic] now, I am [b]eing [d]enied this treatment option. Due to the [m]edical [d]epartment [sic] actions my Pennsylvania

- 7 -

and United States constitutional rights were violate [sic]. The Eighth Amendment forbids failing to act despite knowledge of a substantial risk of serious harm. Farmer-v-Brennan [sic][,] 511 U.S. 825, 842 (1994). Surely me being a life [l]ong [a]sthmatic sufferer and [j]ust suffering an [a]sthma attack the [d]ay before constitutes a substantial risk of serious harm. The relief I am seeking is for me to be [p]rovided a daily duoneb [n]ebulizer [b]reathing treatment and for my medical case to be removed from PA-C Talasky [d]ocket [sic]. Additionally[,] I seek [d]amages in the [a]mount of $500,000.

(Doc. 1-3 at 2–3.)

On August 4, 2025, Booher issued a Facility Manager's Appeal Response in which he upheld Campbell's denial of relief. *See* (Docs. 1 ¶20; 1-4 at 2). In his Response, Booher stated:

I have taken the opportunity to review your submitted appeal in detail coupled with a thorough review of your Official Inmate Grievance, Initial Grievance Response, and facts surrounding your entire complaint.

I see where Nurse Campbell completed an accurate and appropriate grievance response connected to your alleged claim. I have consulted with Nurse Campbell as well as other professional staff at the facility based on your grievance appeal.

I have taken a deeper dive into your situation[,] and I have investigated your claims. Nurse Campbell gave you a fair review and provided information where applicable. My response is direct and to the point. We have no empirical evidence to substantiate any of your claims around cruel and unusual punishment. Medical had upheld all protocols, procedures [sic] linked to policy. I do not see where any violations have occurred. You were treated appropriately.

(Doc. 1-4 at 2.)

- 8 -

On August 19, 2025, Blount filed an appeal from Booher's decision to the DOC Secretary's Office of Inmate Grievances & Appeals ("SOIGA"). *See* (Docs. 1 ¶21; 1-5 at 2–3.) In this appeal, Blount stated as follows:

> On 6-29-25 at approx. 5:20 p.m.[,] I had an "[a]sthma [a]ttack" due to the extreme heat and humidity. Upon arriving at the medical department[,] I was examined by Nurse Zoe. She listened to my lungs which was [sic] wheezing badly and immediately prescribed me a duoneb [n]ebulizer treatment. Additionally[,] nurse Laura contacted the on-call provider via video conference. [T]he on[-]call provider ordered me two additional duoneb nebulizer treatments. In the Initial Review [R]esponse[,] "RNS" Lisa Campbell said I did not wish to have the other duoneb [n]ebulizer treatments that the on-call provider ordered after being administered one duoneb [n]ebulizer treatment. I wanted to save the additional two treatments for a later date in case that I needed them. Using three back-to-back-to-back duoneb [n]ebulizer treatments isn't safe. [T]hese treatments raises [sic] your blood pressure to dangerous levels when used in excess.
>
> The following day[,] on 6-30-25[,] I was seen at sick call by Physician Assistant C. Talasky. I informed her of my medical emergency with me having an [a]sthma [a]ttack due to the extreme heat and humidity. Due to this event[,] I requested a daily duoneb nebulizer breathing treatment because of the hot and humid weather which aggravates and causes me to have asthma [a]ttacks. P.A. Talasky denied me this life[-]saving treatment option even after almost dying, even as I emphasized this point my pleas were denied. "RNS" Lisa Campbell quoted P.A. Talasky as saying if my rescue inhaler didnt [sic] work after two uses or if my symptoms worsened[,] I was to contact the medical [d]department. Anything worse then [sic] an asthma attack is "DEATH." Why do I need to be put in a medical emergency in order to receive a duoneb [n]ebulizer treatment. [sic]

> From October of 2018 thru [sic] November of 2019[,] I was given two daily duoneb [n]ebulizer treatments here at SCI Benner Township. How come [sic] now I am being denied this treatment option?
>
> Due to the Medical Department [sic] actions my Pennsylvania and United States constitutional rights were violated. The Eighth Amendment forbids failing to act despite knowledge of a substantial risk of serious harm. Farmer-v-Brennan[,] 511 U.S. 825, 842 (1994). Surely me being a [l]ife[-]long [a]sthmatic sufferer and just the day prior suffering an [a]sthma [a]ttack constitute [sic] a substantial risk of serious harm. The relief I am seeking is for me to be provided a daily duoneb [n]ebulizer [b]reathing treatment and [f]or my case load [sic] to be removed from "P.A." C. Talasky [sic] Dockett [sic]. Additionally[,] I seek damages in the [a]mount of $500,000. This is my second time having to mail this appeal out. [F]irst time it wasnt [sic] mailed out.

(Doc. 1-5 at 2–3.)

SOIGA issued a Final Appeal Decision denying Blount's appeal on October 1, 2025. *See* (Docs. 1 ¶22; 1-6 at 2). This Decision, which was signed by DOC Chief Grievance Coordinator Keri Moore, indicated that:

> [a] review of the record was conducted by the Bureau of Health Care Services regarding your medical concerns. Your medical record was reviewed, and it was determined that the medical care provided was reasonable an appropriate, to include the medical encounter on 6/30/2025. The findings of this review concur with the Initial Review Response.

(Doc. 1-6 at 2.)

Based on these allegations, Blount asserts the following claims against Defendants: (1) Section 1983 claims against Talasky and Campbell for

deliberate indifference to his serious medical needs in violation of the Eighth Amendment of the United States Constitution; (2) Section 1983 supervisory liability claims against Harry, Booher, and Campbell for failure to train, failure to supervise, and unlawful practices, policies, or customs; (3) Pennsylvania-law professional negligence/medical malpractice claims against Talasky and Campbell; and (4) claims for violations of Title II of the ADA and Section 504 of the RA against the DOC, Harry, and Booher. *See* (Doc. 1 at 6–10). Blount asserts his claims against Talasky, Campbell, Booher, and Harry in their individual and official capacities. *See* (*id.* ¶¶ 4–6). For relief, Blount seeks: (1) compensatory and punitive damages against Talasky, Campbell, Booher, and Harry in their individual capacities; (2) compensatory damages against the DOC, as well as Harry and Booher in their official capacities, on his RA claims; (3) prospective injunctive and declaratory relief against the DOC, Harry, and Booher, on his RA and ADA claims; and (4) an order for prospective injunctive relief allowing him to use daily duo nebulizer breathing treatments, prohibiting any retaliation, and requiring monitoring. *See* (*id.* at 10–11).

## II.    LEGAL STANDARDS

### A.    Applications for Leave to Proceed *in Forma Pauperis*

Under 28 U.S.C. §1915(a)(1), a district court "may authorize the commencement . . . of any [civil] suit, . . . without prepayment of fees or security therefor, by a person who submits an affidavit that includes a statement of all assets such prisoner possesses that the person is unable to pay such fees or give security therefor."[2] *Id.* This statute

> "is designed to ensure that indigent litigants have meaningful access to the federal courts." *Neitzke v. Williams*, 490 U.S. 319, 324, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Specifically, Congress enacted the statute to ensure that administrative court costs and filing fees, both of which must be paid by everyone else who files a lawsuit, would not prevent indigent persons from pursuing meaningful litigation. [*Deutsch v. United States*, 67 F.3d 1080, 1084 (3d Cir. 1995)]. Toward this end, §1915(a) allows a litigant to commence a civil or criminal action in federal court *in forma pauperis* by filing in good faith an affidavit stating, among other things, that [they are] unable to pay the costs of the lawsuit. *Neitzke*, 490 U.S. at 324, 109 S.Ct. 1827.

*Douris v. Middletown Twp.*, 293 F. App'x 130, 131–32 (3d Cir. 2008) (unpublished).

---

[2] "The reference to prisoners in §1915(a)(1) appears to be a mistake. *In forma pauperis status* is afforded to all indigent persons, not just prisoners." *Douris v. Middletown Twp.*, 293 F. App'x 130, 132 n.1 (3d Cir. 2008) (unpublished).

**B.      Screening Complaints Under 28 U.S.C. §§1915A and 1915(e)(2)**

The Court must "review . . . a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. §1915A(a). If such a complaint fails to state a claim upon which relief may be granted, the Court must dismiss the complaint. *See id.* §1915A(b)(1). The Court has a similar screening obligation regarding actions filed by individuals proceeding *in forma pauperis*. *See id.* §1915(e)(2)(B)(ii) ("[T]he [C]ourt shall dismiss the case at any time if the [C]ourt determines that . . . the action or appeal . . . fails to state a claim on which relief may be granted . . . .").

In reviewing legal claims under Sections 1915A(b) or 1915(e)(2)(B), the Court applies the standard governing motions to dismiss filed under Federal Rule of Civil Procedure 12(b)(6). *See, e.g.*, *Smithson v. Koons*, No. 15-cv-1757, 2017 WL 3016165, at *3 (M.D. Pa. June 26, 2017) ("The legal standard for dismissing a complaint for failure to state a claim under §1915A(b)(1) [and] §1915(e)(2)(B)(ii) . . . is the same as that for dismissing a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure."), *report and recommendation adopted*, 2017 WL 3008559 (M.D. Pa. July 14, 2017); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010) (explaining that when dismissing a complaint pursuant to Section

- 13 -

1915A, "a court employs the motion to dismiss standard set forth under Federal Rule of Civil Procedure 12(b)(6)"). To avoid dismissal under Rule 12(b)(6), a plaintiff must set out "sufficient factual matter" in the complaint to show that their claims are facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

When evaluating the plausibility of a complaint, the Court accepts as true all factual allegations and all reasonable inferences that can be drawn from those allegations, viewed in the light most favorable to the plaintiff. *See id.*; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010). However, the Court will not accept legal conclusions as true, and "a formulaic recitation of the elements of a cause of action" will not survive a district court's screening under Sections 1915A and 1915(e)(2)(B). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

- 14 -

In addition, in the specific context of *pro se* litigation, the Court must be mindful that a document filed *pro se* is "to be liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011) (explaining that "when presented with a *pro se* litigant, we have a special obligation to construe [their] complaint liberally" (citation and internal quotation marks omitted)). Therefore, a *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks omitted) (quoting *Estelle*, 429 U.S. at 106). Moreover, when construing a *pro se* complaint, the Court will "apply the relevant legal principle even when the complaint has failed to name it." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013). However, *pro se* litigants "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants." *Id.* at 245.

## C.   Section 1983

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. §1983. This statute states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

- 15 -

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution or laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*Id.* "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002)). "To state a claim under §1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

## III.  DISCUSSION

### A.    The IFP Application

After reviewing the IFP Application, it appears that Blount lacks the financial means to prepay the filing fee in this matter. Therefore, the Court will grant the IFP Application and allow Blount to proceed *in forma pauperis* in this action.[3]

---

[3] However, because Blount is a prisoner, he is advised that he will be obligated to pay the filing fees for this case in installments in accordance with the Prison Litigation Reform Act ("PLRA"), regardless of the outcome. *See* 28 U.S.C. §1915(b).

- 16 -

**B.      Screening the Complaint**

      **1.      Section 1983 Claims**

            **a.      Eighth Amendment Deliberate-Indifference-to-Serious-Medical-Needs Claims**

                  **i.      Against Talasky**

Blount alleges that Talasky was deliberately indifferent to his serious medical needs on June 30, 2026, when she denied his request for a daily nebulizer for his asthma as well as his request for the two additional duo-nebulizers that Wellpath ordered at the time he was suffering from an asthma attack the prior day. *See* (Doc. 1 ¶¶13–16, 28–29). These allegations are insufficient to state a plausible Eighth Amendment claim against Talasky; as such, the Court will dismiss this claim for the failure to state a claim under Section 1915(e)(2)(B)(ii).

For Blount to state a plausible Eighth Amendment claim based on the failure to provide adequate medical treatment, he must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* at 837. A

plaintiff properly alleges deliberate indifference "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (explaining that a prisoner-plaintiff can show deliberate indifference where prison official "intentionally den[ied] or delay[ed] access to medical care or intentionally interfer[ed] with the treatment once prescribed" (internal citations and quotation marks omitted)). Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *see also Estelle*, 429 U.S. at 106 (explaining that complaints that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment [as] medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 330 (3d Cir. 2020) ("Deliberate indifference requires significantly more than negligence."); *Montanez v. Price*, 154 F.4th 127, 141 (3d Cir. 2025) (pointing

- 18 -

out that "disagreement between the prisoner and medical personnel over the proper course of treatment" does not show deliberate indifference (citing *Spruill*, 372 F.3d at 235)).

Here, Blount's allegations against Talasky fail to show that she was deliberately indifferent to his serious medical needs for several reasons.[4] First, Blount does not allege that he required medical treatment when he met with Talasky during sick call on June 30, 2025. Although he suffered from an asthma attack the prior day, he does not allege that he was still suffering from the attack at the time he saw Talasky. In other words, this is not an instance where he was suffering from an asthma attack and Talasky did not give him a nebulizer treatment to treat the attack.

Second, Blount does not allege that Talasky denied him necessary medical treatment based on a non-medical reason. Third, he does not allege that Talasky prevented him from receiving needed or recommended medical treatment. Regarding the two additional nebulizers Wellpath allegedly ordered, as already stated, Blount does not allege that he was suffering from an asthma attack at the time he visited with Talasky; instead, he had the attack the prior day. In addition, although Wellpath prescribed him two

---

[4] The Court presumes that Blount's asthma constitutes a serious medical need for purposes of this Memorandum.

additional nebulizers at the time he was suffering from his asthma attack, Talasky's decision to not allow him to take them with him to his cell does not plausibly demonstrate her deliberate indifference. He does not allege that Wellpath ordered that he receive the two nebulizers to take with him following his asthma attack subsiding, *i.e.*, he could take them with him for his personal use as needed.[5] He also does not allege that Talasky told him that those nebulizers were unavailable to him if the circumstances warranted it. She just did not let him take the nebulizers with him to his cell like he wanted to do.

This same rationale applies to Blount's claim pertaining to Talasky's denial of daily nebulizer treatments for him. He does not allege that any medical professional prescribed those treatments for him or determined that they were necessary to treat his asthma generally or in light of the hot and humid weather. Moreover, Blount's allegations relating to his asthma attack belie his claim that he needed to have a daily nebulizer treatment or possess the two additional nebulizer treatments with him in his cell. He alleges that upon suffering his asthma attack in the late afternoon on June 29, 2025, he pressed an emergency button in his cell to get the attention of a correctional

---

[5] In his appeal to the Facility Manager, Blount stated that he "wanted to have the treatments in reserve to use later on at a later date." (Doc. 1-3 at 2–3.)

- 20 -

officer. A correctional officer responded, listened to Blount's request to contact the medical department because he was suffering from an asthma attack, contacted the medical department, and informed Blount that he was to go to the medical department. Blount then presumably walked to the medical department (as he does not allege that he was transported there via a wheelchair or gurney), was examined by a nurse, and received a nebulizer treatment which appears to have provided him with relief from the asthma attack. No aspect of this series of events remotely shows that Talasky or anyone in the medical department would not give him a nebulizer treatment if he suffered from a future asthma attack. These events also show that it was unnecessary for Blount to have a nebulizer in his cell.

Finally, Blount's claims relating to Talasky declining to allow him to take the two nebulizers to his cell and denying his request for a prescription for a daily nebulizer "essentially amount to a mere disagreement as to the proper medical treatment,' which does not support a claim of deliberate indifference. *See Moy v. Keenan*, No. 18-cv-1575, 2022 WL 480880, at *16 (M.D. Pa. Feb. 16, 2022) (quoting *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)), *aff'd sub nom.*, 2023 WL 3717517 (3d Cir. May 30, 2023) (unpublished). Overall, Blount's allegations show that Talasky did not intentionally refuse to provide him with needed

- 21 -

medical treatment, delayed necessary medical treatment for a non-medical reason, or prevented him from receiving needed or recommended medical treatment. Accordingly, the Court will dismiss Blount's Section 1983 Eighth Amendment deliberate-indifference-to-serious-medical-needs claim against Talasky for failure to state a claim under Section 1915(e)(2)(B)(ii).

### ii.   Against Campbell

Blount alleges that Campbell was deliberately indifferent to his serious medical needs because she "participated in [the] grievance review and medical operations." (Doc. 1 ¶4.) He also asserts that Campbell "consciously disregarded the on[-]call provider medical treatment plan by denying [his d]uo-nebulizer breathing treatment," "interfer[ed] with access to treatment," and "fail[ed] to provide treatment for diagnosed conditions," all of which "caused unnecessary and wanton infliction of pain [and] deterioration." (*id.* ¶29.) These allegations are insufficient to state a plausible Eighth Amendment deliberate-indifference-to-serious-medical-needs claim against Campbell.

Initially, the Court notes that it is questionable that Blount has sufficiently alleged Campbell's personal involvement in any Eighth Amendment violation. A plaintiff asserting a Section 1983 claim must allege the personal involvement of each defendant in the alleged constitutional

- 22 -

violation; in other words, the plaintiff must state how each defendant was involved in the events and occurrences giving rise to the claims in the operative complaint. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.); *Iqbal*, 556 U.S. at 676 (explaining that "[b]ecause vicarious liability is inapplicable to . . . §1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). "A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode*, 845 F.2d at 1207); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (stating that "[p]ersonal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence'" (quoting *Rode*, 845 F.2d at 1207)); *see also Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (explaining that Section 1983 defendants "must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which [they] neither participated in nor approved").

Additionally, in pursuing any Section 1983 claim against prison officials, a plaintiff may not rely solely on *respondeat superior*, *see Chavarriaga*, 806 F.3d at 227 ("[Plaintiff] cannot predicate liability on her §1983 claims on a *respondeat superior* basis." (citing *Rode*, 845 F.2d at 1207)), which is a theory of liability that "arises 'solely on the basis of the existence of an employer-employee relationship,' regardless of whether the employer had any part in causing harm[,]" *see Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 692 (1978)). Instead, if Blount seeks to hold a supervisory official such as Campbell liable for unconstitutional acts by her or her subordinates, his allegations must satisfy one of two theories of supervisory liability: First, "[i]ndividual defendants who are policymakers may be liable under §1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm[;]" and second, "a supervisor may be personally liable under §1983 if [they] participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in [their] subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted); *see Barkes v. First Corr.*

- 24 -

*Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) (explaining requirements for supervisory liability in section 1983 claim and describing "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates"), *rev'd on other grounds sub nom., Taylor v. Barkes*, 575 U.S. 822 (2015).

To allege a plausible claim for supervisory liability under the first theory—the policy-and-practice strand of supervisory liability—a plaintiff must

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure. Put another way, the inmate must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury.

*Chavarriaga*, 806 F.3d at 227 (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001)). For the second theory of supervisory liability—participating in, directing others to, or knowledge and acquiescence of constitutional violation—generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional

- 25 -

violation. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (unpublished) ("Saisi asserted that some defendants were in charge of agencies that allowed this to happen, and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of [their] position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005))); *Zigler v. Warren*, No. 21-cv-19474, 2022 WL 903383, at *2 (D.N.J. Mar. 28, 2022) ("In simpler terms, a supervisor is not liable for the unconstitutional conduct of his employees solely because he is a supervisor."). Additionally, "[a]lthough a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Chavarriaga*, 806 F.3d at 222 (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995); *Rode*, 845 F.2d at 1201 n.6).

Here, Blount's allegations do not satisfy the first theory of supervisory liability because he has not pleaded facts showing that Campbell established a policy, practice, or custom leading to an Eighth Amendment violation. His only allegation about a policy, practice, or custom is when he alleges that:

> [Campbell, Booher, and Harry] maintained or tolerated polices/customs that allowed a known [a]sthmatic patient who just suffered an asthmatic attack to be denied his treatment plan that was authorized and prescribed by the on-call provider

> (Wellpath) and failed to train/supervise staff to ensure that [sic] proper asthmatic care and ADA/RA compliance. With actual or constructive knowledge of these practices, [these Defendants] failed to correct them causing [his] constitutional injuries.

(Doc. 1 ¶31.)

These allegations are insufficient to show that Campbell established a policy, practice, or custom because he does not sufficiently identify the policy at issue. Instead, he tries to manufacture a policy, practice, or custom based on his interaction with Talasky and Campbell's denial of his grievance and request for daily nebulizers. He also does not identify any facts showing that he did not receive proper asthmatic care; he just did not get what he wanted. He further does not allege any facts showing that Campbell was deliberately indifferent to any known risk. Moreover, any policy, practice, or custom in place did not lead to an Eighth Amendment violation because Talasky did not commit a violation, and Blount was not injured by her conduct. *See Allen v. Eckard*, 804 F. App'x 123, 127 (3d Cir. 2020) (concluding that plaintiff's failure to train and supervise claims asserted against supervisor defendants were meritless where they failed to make a plausible showing of an underlying constitutional violation by a subordinate official).

As for the second theory of supervisory liability, Blount does not allege that Campbell directed Talasky or any other SCI Benner Twp. employee to violate his constitutional rights. Thus, Blount can only show Campbell's

personal involvement if she participated in violating his rights or knew of and acquiesced in Talasky violating his rights.

The only conduct Blount attributes to Campbell in his complaint is her denial of his grievance. The mere filing of a grievance is generally insufficient to impute the actual knowledge that is necessary to demonstrate a defendant's personal involvement in an asserted constitutional violation. *See Rode*, 845 F.2d at 1207–08 (finding that the filing of a grievance with the Governor-defendant's office was insufficient to demonstrate that the Governor himself had personal knowledge of the alleged wrongdoing). Moreover, grievances that complain of events that have already occurred and that are in the past are insufficient to show that defendants who respond to such grievances were personally involved in the asserted constitutional violations. *See Sims v. Wexford Health Sources*, 635 F. App'x 16, 19–20 (3d Cir. 2015) (unpublished) ("If an official's only involvement is the investigation or adjudication of an inmate grievance after the event giving rise to the grievance has happened, that is not considered to be personal involvement." (citing *Rode*, 845 F.2d at 1208)); Robles v. Casey, No. 10-cv-02663, 2011 WL 398203, at *2 (M.D. Pa. Feb. 3, 2011) (concluding that plaintiff had not shown personal involvement where "plaintiff's grievance only reported violations that had occurred in the past"); *see also Mincy v. Chmielsewski*,

- 28 -

508 F. App'x 99, 104 (3d Cir. 2013) (unpublished) ("[T]he District Court is correct that an officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement.") (citation omitted)).

The Third Circuit Court of Appeals has, under certain, limited circumstances, determined that a supervisory official's response to a grievance may be sufficient to show that official's personal involvement in the plaintiff's asserted constitutional claims. *See, e.g., Sutton v. Rasheed*, 323 F.3d 236, 249–50 (3d Cir. 2003), *as amended* (May 29, 2003) (finding that prisoner-plaintiffs established the personal involvement of a defendant who played an "active role" in the continued denial of their access to religious texts and basing this finding, in part, on the fact that the defendant issued a written response denying a final-grievance-appeal letter from one of the plaintiffs, which requested access to such religious texts); *Johnson v. Wireman*, 809 F. App'x 97, 100 (3d Cir. 2020) (unpublished) (concluding that plaintiff's allegations that state prison superintendent's and grievance officer's responses to grievances which went beyond merely denying the grievances to allegedly coerce the plaintiff to change his religious practices showed sufficient personal involvement); *Diaz v. Palakovich*, 448 F. App'x 211, 215 (3d Cir. 2011) (unpublished) (vacating district court's grant of

- 29 -

summary judgment where the district court failed to consider grievances pertaining to a pattern of ongoing wrongful conduct, and explaining that a reasonable factfinder could find that (a) the defendants had knowledge of such wrongful conduct through the prisoner's grievances and (b) had acquiesced in such conduct by failing to address the ongoing pattern of wrongful conduct). However, the facts in those cases involved either: (1) the supervisory officials response to the grievances constituting an alleged constitutional violation, such as by encouraging the plaintiff to change their religious practices, *see Sutton*, 323 F.3d at 249–50 (determining that evidence showing that supervisory official responded to final appeal of grievance in which the plaintiff complained that he was denied religious texts by criticizing those texts, "appear[ed] to have play an active role" in the alleged constitutional violation); *Johnson*, 809 F. App'x at 100 & n.20 (concluding that district court erred in dismissing the plaintiff's claims for First Amendment violations against grievance officer and prison superintendent because the plaintiff alleged that the grievance officer and superintendent advised the plaintiff to observe the fasting practice of a different religion); or (2) the supervisory officials learned about the alleged constitutional violations through a grievance and acquiesced in the violations by failing to address an ongoing constitutional violation, *see Diaz*, 448 F. App'x at 215 (concluding

that "a reasonable factfinder could find that these [supervisory] defendants had knowledge of the violations through [the plaintiff's] grievances and acquiesced in the violations by failing to address a practice of opening legal mail outside of an inmate's presence"); *McCollum v. Pries*, No. 22-cv-1710, 2024 WL 1416502, at *7 (M.D. Pa. Apr. 2, 2024) ("[R]esponding to a grievance that complains of events that are ongoing and denying the requested relief may constitute the knowledge and acquiescence that is necessary to show personal involvement in a Section 1983 action."); *Roberts v. Luther*, No. 21-cv-958, 2021 WL 5233318, at *5 (M.D. Pa. Nov. 10, 2021) ("Several courts have concluded that a supervisory official may be held liable in connection with a review of grievances alleging an ongoing violation because the official 'is personally involved in that violation because [they are] confronted with a situation [they] can remedy directly.'" (quoting *Mayo v. Oppman*, No. 17-cv-311, 2018 WL 1833348, at *4 (W.D. Pa. Jan. 23, 2018), *report and recommendation adopted*, 2018 WL 943528 (W.D. Pa. Feb. 20, 2018))).

Here, Blount does not identify an ongoing constitutional violation in his grievance to Campbell. Rather, he identifies a single incident in which Talasky denied his request for a prescription for daily nebulizers as well as his request to take the two, already-ordered nebulizers with him to his cell.

- 31 -

Moreover, he filed his grievance on the same day that Talasky denied his requests, which further shows that he complains about a single incident. Therefore, Blount has not plausibly pleaded that Campbell acquiesced in any alleged violation by failing to address an ongoing constitutional violation.

On the other hand, Blount possibly plausibly alleges Campbell's personal involvement insofar as Campbell, a medical professional, expressly denied his request for daily nebulizer treatments in her response to his grievance. *See* (Doc. 1-2 at 2 ("[T]his grievance is denied, you will not beawarded [sic] a monetary amount or be prescribed daily nebulizer treatments.")). However, even if Campbell's denial of his request for a daily nebulizer is sufficient to show personal involvement, his allegations still fail to state a plausible claim for deliberate-indifference-to-his-serious-medical-needs claim against Campbell. Similar to his allegations against Talasky, Blount does not allege any facts showing that Campbell intentionally refused to provide him with needed medical treatment, delayed necessary medical treatment for a non-medical reason, or prevented him from receiving needed or recommended medical treatment. Accordingly, the Court will also dismiss Blount's Section 1983 Eighth Amendment deliberate-indifference-to-serious-medical-needs claim against Campbell for failure to state a claim under Section 1915(e)(2)(B)(ii).

**b.** **Section 1983 Failure-to-Train, Failure-to-Supervise, and Unconstitutional Policy, Practice, or Custom Claims**

Blount asserts that Campbell, Booher, and Harry are liable under Section 1983 due to their failure to train, failure to supervise, and maintenance of an unconstitutional policy, practice, or custom. *See* (Doc. 1 at 7–8). The Court will dismiss these claims due to Blount's failure to state a claim upon which relief can be granted under Section 1915(e)(2)(B)(ii).

As for Blount's assertion that Campbell, Booher, and Harry maintained an unconstitutional policy, practice, or custom, the Court has already determined that Blount failed to plead facts showing that Campbell established an unconstitutional practice, policy, or custom. The same rationale applies to Blount's similar claims against Booher and Harry.

Regarding a failure to train or failure to supervise, Blount fails to allege facts for a plausible claim of supervisory liability against Campbell, Booher, or Harry. As noted above, a supervisory claim requires "a showing that there was an actual constitutional violation at the hands of subordinates" before finding liability on the part of the supervisor prison official. *See Allen*, 804 F. App'x at 127; *Telepo v. Palmer Twp.*, 40 F. Supp. 2d 596, 612 (E.D. Pa. 1999) ("The Court having found that there was no constitutional violation committed by the underlying officers, supervisory liability cannot be imposed

- 33 -

upon Chief Fretz for an alleged failure to train and supervise."), *aff'd*, 242 F.3d 371 (3d Cir. 2000). Blount has not plausibly pleaded any constitutional violation by a subordinate. Therefore, his failure-to-train and failure-to-supervise claims fail as well. Accordingly, the Court will dismiss Blount's Section 1983 claims for failure to protect, failure to supervise, and for an unconstitutional practice, policy, or custom, for failure to state a claim upon which relief can be granted under Section 1915(e)(2)(b)(ii).[6]

### 2.    ADA and RA Claims

Blount asserts claims under Section 504 of the RA and Title II of the ADA against the DOC, and against Harry and Booher in their official capacities. (Doc. 1 at 9.) As with Blount's other claims, the Court concludes that he fails to state plausible claims for relief under the ADA or RA and will dismiss them for failure to state a claim under Section 1915(e)(2)(B)(ii).

The ADA and RA "establish 'an affirmative obligation for public entities to make benefits, services, and programs accessible to people with disabilities.'" *Haw. Disability Rts. Ctr. v. Kishimoto*, 122 F.4th 353, 361 (9th Cir. 2024) (quoting *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017)). One of the purposes of the RA is "to empower individuals with

---

[6] These claims were not included in any part of Blount's initial grievance or administrative appeals. *See* (Docs. 1-1, 1-3, 1-5).

disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society . . . ." 29 U.S.C. §701(b)(1). As for the ADA, it "embodies a 'national mandate for the elimination of discrimination against individuals with disabilities[,]' 42 U.S.C. §12101(b)(1)[, which is] performed across 'three titles of regulation—Title I (employers), Title II (governments), and Title III (public accommodations).'" *Zangara v. Nat'l Bd. of Med. Examiners*, Nos. 24-2664, 24-2672, 2025 WL 1218188, at *4 (3d Cir. Apr. 28, 2025) (unpublished) (quoting *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 176 (3d Cir. 2019)). Because the DOC, Harry, and Booher are a state entity and state employees, respectively, Title II of the ADA applies to Blount's ADA claims against them.

Title II of the ADA and Section 504 of the RA provide similar protections. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132(1). Section 504 states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination

under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a).

In addition to providing similar protections, Title II and Section 504 require substantially similar factual allegations to state plausible claims for relief. Under both statutes, plaintiffs must allege that "(1) they are qualified individuals; (2) with a disability; and (3) they were excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or were subjected to discrimination by any such entity; (4) by reason of their disability." *Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023) (citing *Haberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018)). Also, "[w]here compensatory damages are sought, a plaintiff must also show intentional discrimination under a deliberate indifference standard." *Id.* (citing *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019)); *see also D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 270 (3d Cir. 2014) (requiring plaintiff seeking to establish deliberate indifference to show "(1) [actual] knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that [actual] knowledge" (quoting *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 265 (3d Cir. 2013))).

"Congress has directed the courts to construe the ADA and the [RA] such that conflicting standards do not arise." *New Directions Treatment*

- 36 -

*Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007) (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998)); *see also S.H. ex rel. Durrell*, 729 F.3d at 260 ("The same standards govern both the RA and the ADA claims."). Nevertheless, "the ADA and the [RA] are not exactly the same." *New Directions Treatment Servs.*, 490 F.3d at 300 n.4. For instance, under Section 504, a plaintiff must also allege that "the program in question received federal dollars." *Durham*, 82 F.4th at 225 (citing 29 U.S.C. §794 and *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021)); *see also Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 279 (3d Cir. 1996) (explaining that the ADA "extends the nondiscrimination rule of Section 504 of the [RA] to services provided by any 'public entity' without regard to whether the entity is a recipient of federal funds").

Additionally, the causation elements of Section 504 and Title II differ. *See Durham*, 82 F.4th at 226. Section 504 requires a plaintiff to establish that "the disability [was] the sole cause of the discriminatory action." *Id.* (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235–36 & n.11 (3d Cir. 2013)); *see also* 29 U.S.C. §794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .").

- 37 -

Thus, "[a]n alternative cause of why a plaintiff was treated differently is fatal to a claim under the [RA] 'because disability would no longer be the sole cause.'" *Lewald v. Pa. Dep't of Corr.*, No. 22-cv-4625, 2025 WL 1568286, at *3 (E.D. Pa. June 3, 2025) (quoting *CG*, 734 F.3d at 236 n.11). On the other hand, Title II "only requires but-for causation," *Durham*, 82 F.4th at 226 (citing *CG*, 734 F.3d at 235–36 & n.11), *i.e.* that the plaintiff establish that the discriminatory action was "by reason of [the plaintiff's] disability." 42 U.S.C. §12132.

In this case, Blount's allegations in his complaint fail to allege a plausible Section 504 or Title II official-capacity claim against Defendants. Preliminarily, the Court notes that Blount's official-capacity claims against Harry and Booher are duplicative of his claims against the DOC. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell*, 436 U.S. at 690 n.55)). As such, the Court will dismiss Blount's official-capacity ADA and RA claims against Harry and Booher as duplicative.

As for Blount's claims against the DOC, presuming that he has sufficiently alleged that he is a qualified individual with a disability, he does not allege facts showing how he was excluded from participation in or denied

any benefits from the services, programs, or activities of SCI Benner Twp. As stated above, Blount could receive a nebulizer treatment if the circumstances warranted it. His dissatisfaction with Talasky's decision to deny his request to take the two nebulizers back to his cell as well as his request for a daily nebulizer, does not equate to him being excluded from or denied services.

Just as importantly, Blount does not allege facts creating a reasonable inference that he was excluded from or denied any services solely, or in part, because of his disability. To the contrary, the complaint contains only conclusory allegations of discrimination, *see, e.g.*, (Doc. 1 ¶39), and no allegations about any failure to accommodate. Overall, Blount's allegations are wholly insufficient to plausibly plead the causation necessary to support that he was denied the two nebulizers and daily nebulizer treatment solely or by reason of his disability. *See, e.g.*, *Alvarez v. City of Phila.*, No. 23-cv-3570, 2023 WL 6520507, at *3 (E.D. Pa. Oct. 4, 2023) (dismissing ADA claim for failure to accommodate where plaintiff alleged only in conclusory fashion that her employer failed to provide reasonable accommodations for her disability); *Elbert v. N.Y. State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) ("[C]ourts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the

- 39 -

inmate was treated differently because of his or her disability."). Further, while Blount complains that Talasky and Campbell were deliberately indifferent to his serious medical needs because they denied his requests for daily nebulizers and the two, additionally ordered nebulizers, any deficient treatment does not create a reasonable inference that he was treated in a particular manner solely based on or because of his disability. *See, e.g., Iseley v. Beard*, 200 F. App'x 137, 142 (3d Cir. 2006) (unpublished) ("Iseley does not claim that he was excluded from any program on the basis of his disability. Rather he claims that he was denied medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions." (citation omitted)); *see also Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (holding that "the [ADA] would not be violated by a prison[] simply failing to attend to the medical needs of its disabled prisoners"). Accordingly, Blount has failed to state plausible claims for relief under either Title II of the ADA or Section 504 of the RA against the DOC, or Harry and Booher in their official capacities, and the Court will dismiss these claims for failure to state a claim upon which relief can be granted pursuant to Section 1915(e)(2)(B)(ii).[7]

---

[7] Although this is not the basis for the Court dismissing Blount's ADA and RA claims, he included no statements in his grievance or administrative

*(footnote continued on next page)*

### 3.    State-Law Negligence and Medical Malpractice Claims

Blount asserts state-law negligence and medical malpractice claims against Talasky and Campbell. *See* (Doc. 1 at 8). However, due to the Court's resolution of Blount's Section 1983, ADA, and RA claims, there is currently no viable federal claim before the Court supporting the exercise of supplemental jurisdiction over his state-law claims. *See* 28 U.S.C. §1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (stating that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so"). The Court finds that consideration of "judicial economy, convenience, and fairness to the parties" does not "provide an affirmative justification" for retaining jurisdiction over Blount's negligence and medical malpractice claims. *See Hedges*, 204 F.3d at 123. Therefore, the Court will decline to

---

appeals indicating that he believed he was discriminated against. He also does not mention Booher or Harry in these documents.

exercise supplemental jurisdiction over Blount's state-law negligence and medical malpractice claims.[8]

There is also no independent basis for jurisdiction over this state-law claim pursuant to the diversity jurisdiction statute, 28 U.S.C. §1332(a). Blount does not sufficiently allege the citizenship of the parties insofar as he pleads only his place of incarceration and Defendants' places of employment. *See Washington v. Hovensa LLC*, 652 F.3d 340, 344 (3d Cir. 2011) (stating hat an individual is a citizen of the state where they are domiciled, meaning the state where they are physically present and intend to remain indefinitely); *Pierro v. Kugel*, 386 F. App'x 308, 309 (3d Cir. 2010) (unpublished) ("[T]he domicile of a prisoner before [their] imprisonment presumptively remains [their] domicile during [their] imprisonment."). Accordingly, the Court will dismiss Blount's negligence and professional negligence claims without prejudice to him refiling them in the appropriate Pennsylvania forum.

### C.   Leave to Amend

Having determined that Blount's claims against Defendants in his complaint are subject to dismissal, the Court must decide whether to grant

---

[8] 42 Pa. C.S. §5103 provides the process that a litigant can follow to ensure that their claims dismissed in federal court can be transferred (by the litigant, not by the court) to state court to preserve the statute of limitations on any claim.

him leave to file an amended complaint. Although district courts should generally give leave to amend, they may dismiss a complaint with prejudice where leave to amend would be inequitable or futile. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007) ("[I]n civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile."); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) ("When a plaintiff does *not* seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that [they have] leave to amend within a set period of time, unless amendment would be inequitable or futile."). "In determining whether [amendment] would be futile, the district court applies the same standard of legal sufficiency as [it] applies under Fed. R. Civ. P. 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).

In this case, the Court will not grant Blount leave to file an amended complaint because doing so would be futile. There is nothing about the events described in Blount's complaint, which he repeats almost verbatim in his grievances and administrative appeals, that would provide an avenue for him to amend his complaint to state plausible claims under Section 1983, the

- 43 -

ADA, or the RA. Accordingly, the Court will dismiss with prejudice Blount's Section 1983, ADA, and RA claims under Section 1915(e)(2)(B)(ii).

## IV.   CONCLUSION

For the foregoing reasons, the Court will: (1) grant Blount's IFP Application; (2) dismiss with prejudice his Section 1983, ADA, and RA claims; (3) decline to exercise supplemental jurisdiction over Blount's state-law claims and dismiss those claims without prejudice to him raising them in the appropriate Pennsylvania state court; and (4) direct the Clerk of Court to close this case. An appropriate Order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 4, 2026**
26-0126-01